**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **RAMONE T. GRIFFIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12 C 5143** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ramone T. Griffin brings this action under 42 U.S.C. § 405(g), seeking to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff subsequently filed a motion for summary judgment seeking reversal of the Administrative Law Judge's decision. After careful review of the parties' briefs and the record, the Court now grants Plaintiff's motion and remands the matter for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for SSI on February 17, 2009, alleging that he became disabled beginning on October 3, 2006 due to right femur pain from gunshot wounds and various mental problems. (R. 137-41, 450). Because Plaintiff was incarcerated at the time of

---

[1]    On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security, and is automatically substituted as Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d)(1).

his disability onset date, and thus not eligible for Social Security benefits, he amended his onset date to April 15, 2009, which was the date of his release from prison. (R. 32-33). After receiving the results of consultative examinations from four health care providers concerning Plaintiff's physical and mental condition and residual functional capacity, the Social Security Administration denied the application on June 16, 2009. (R. 68-76). After Plaintiff requested reconsideration, four additional health care providers were consulted between December 2009 and February 2010. (R. 338-43, 348-52, 353-66, 371-73). In addition, x-rays of Plaintiff's right hip were taken and interpreted by a physician (R. 346), and records from the treating psychiatrist were obtained (R. 76, 327-36). Following review of these additional materials, the claim for disability was again denied on February 25, 2010. (R. 73-76).

Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") Kimberly S. Cromer held a hearing on December 7, 2010, where she heard testimony from Plaintiff, represented by counsel, and a vocational expert. (R. 28-65). On January 13, 2011, the ALJ found that Plaintiff is not disabled because he is capable of performing a significant number of jobs available in the national economy. (R. 460-61). Approximately one year later, on January 17, 2012, Plaintiff's new (and current) counsel submitted a detailed "Written Argument In Support of Request for Review." (R. 222-26). The Appeals Council denied this request on April 27, 2012. (R. 441-45).

Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. Plaintiff advances all of the same arguments that he made to the Appeals Council, namely, that the ALJ erred by: (1) failing to justify her determination to give no weight to his treating psychiatrist; (2) failing to account in the

RFC determination for Plaintiff's moderate limitations of concentration, persistence, or pace or his sitting limitations; and (3) finding him only partially credible regarding his symptoms and limitations.

## **FACTUAL BACKGROUND**

Plaintiff was born on January 18, 1977 and was 32 years old when he filed his application in February 2009. (R. 459). He completed twelfth grade and is able to communicate in English. (R. 145, 459). He was incarcerated in the Vienna Correctional Center ("VCC") from December 2007 to April 15, 2009. (R. 32, 365, 440). Prior to his incarceration, he worked full-time in unskilled jobs as a fast food cook and eviction server (moving furniture and other items from homes and businesses into the street), in addition to operating a moving company on a part-time basis. (R. 142, 162-64).

During the hearing before the ALJ, Plaintiff's counsel said the "theory of the case" is that Plaintiff is "not able to sustain sedentary unskilled work because of both physical and mental impairments." (R. 34). Counsel noted that Plaintiff is unable to work physically "because of problems with residual effects of gunshot wounds to both of his legs[,]" including "chronic pain, decreased range of motion, antalgic gait, very difficulty [sic] walking, [and] pain in his right hip when sitting . . . for prolonged periods of time." (*Id.*). As for the mental impairments, counsel argued that Plaintiff "suffers from a diagnosis of a major depressive disorder . . . post-traumatic stress disorder, and we feel that he has a very vocationally significant symptom of anger management that he wouldn't be able to get along with supervisors, co-workers or the public or remain focused and on task and he'd be off task for at least 20% of the work day." (R. 34-35).

**A.     Plaintiff's Medical History**

**1.     Treatment at Vienna Correctional Center in 2007 and 2008**

The earliest medical records for Plaintiff are from December 2007 when he was incarcerated at VCC and underwent intake evaluations for physical and mental health. During the physical examination, Plaintiff reported gunshot wounds to the hip and legs, asthma, and depression.  (R. 229-33).  While he suffered gunshot wounds to the lower extremities in 1995 and 2000 (R. 38, 233, 418), he said he first experienced right femur pain after an October 2006 gunshot wound to his right hip or leg (the record is inconsistent as to which).  (R. 232-33, 338).  At some point after the 2006 gunshot wound, pins and rods were surgically implanted to stabilize his right femur in a process called open reduction and internal fixation surgery ("ORIF").  (R. 141, 338).  The record contains no direct medical documentation of these gunshot wounds or subsequent surgery, though the medical records do reflect that Plaintiff has numerous scars and palpable foreign bodies under the skin.  (R. 302, 340-41, 380).  In addition, x-ray reports reveal the presence of a rod in the right femur and metallic density foreign bodies.  (R. 273).

During the mental health evaluation at VCC, Plaintiff reported suffering from depression for which he was first treated in his teens, and for which he received treatment within the last year, including Zoloft.  (R. 265).  Plaintiff also reporting using alcohol daily and using marijuana.  (*Id.*).  The interviewer observed that Plaintiff "made no indication" of depression or anxiety, claimed to have no social support, and denied trying to harm himself or having recent thoughts of self-harm.  (*Id.*).  The interviewer made a provisional diagnosis of depressive disorder NOS and recommended substance

abuse counseling, referral to a psychiatrist, and Prozac. (R. 265-66). Shortly thereafter, Plaintiff was prescribed three months of Prozac (R. 270), which he repeatedly refused throughout January 2008. (R. 241, 280, 282-89). The medical records do not show whether Plaintiff relented and agreed to take Prozac while he was incarcerated.

On May 4, 2008, Plaintiff complained to VCC treatment center staff of worsening hip pain because the county jail reportedly took away his crutches before his hip was healed. (R. 248). He said that his right hip gets sore when it is cold and he has a "real bad" limp. (*Id.*). He stated that he could not do leg exercises because there is a sharp razor pain from his hip to his knee. (*Id.*). The nurse observed scarring bilaterally in Plaintiff's hips from gunshot wounds, but noted no swelling or redness. (*Id.*). His treatment plan consisted of Ibuprofen or Tylenol and application of hot packs. (*Id.*). Plaintiff returned on May 30, 2008 complaining of continued pain in his right hip rating in severity as "10½" on a scale of 1 to 10. (R. 250). Treatment center staff observed his hip deformity and noted that "prolong[ed] standing/ambulating results in extreme pain." (*Id.*). His treatment plan remained unchanged, and it was noted that at his May 4th visit he was placed on a wait list for follow-up care. (*Id.*).

On June 6, 2008, Plaintiff returned to the treatment center and was given a prescription for 500 mg of Naproxen for the pain in his right hip and femur. (R. 251). X-rays of Plaintiff's right hip and femur were subsequently taken (R. 252), although the record contains no films or radiology reports. Dr. Adrian Cordoba of One Radiology in Normal, Illinois reviewed the x-rays provided by VCC. (R. 273). In a memo dated June 16, 2008, Dr. Cordoba stated:

> Multiple images were obtained. There is an intramedullary rod in place in the right femur with deformity of the proximal right femur which may be due to prior trauma. There are numerous metallic density foreign bodies projecting over the upper right thigh which may be from [a] prior gunshot wound. There is no significant arthritic change seen. There is an area of radiolucency along the proximal femoral diaphysis. This could be due to prior trauma. Underlying osteomyelitis cannot be excluded. There is otherwise no acute bony abnormality seen.

(*Id.*).

On July 14, 2008, Plaintiff requested a Naproxen refill from the treatment center because it "worked very well," while the Motrin and Tylenol did not. (R. 254). Following an evaluation on July 22, 2008, a doctor refilled Plaintiff's prescription for 500 mg pills of Naproxen and ordered a follow-up right femoral x-ray in two months. (R. 255, 293). On September 25, 2008, Plaintiff refused the follow-up x-ray. (R. 263, 294). On October 14, 2008, a doctor refilled Plaintiff's prescription for Naproxen but for a lower dosage of 375 mg. (R. 264). It does not appear that Plaintiff sought further medical treatment for right hip or leg pain for at least a year after this until (as discussed later), he went to the Stroger Hospital ER in December 2009 complaining of pain and seeking Naproxen.

### 2. Bobby E. Wright Health Center Assessments

On April 28, 2009, shortly after his release from prison, Plaintiff visited the Bobby E. Wright Comprehensive Behavioral Health Center ("BEW Center") where an intake assessment was performed. (R. 438-40). The assessment states that Plaintiff complains that he "feels pain all the time," has difficulty sleeping including flashbacks of being shot, and "feels depressed most of the time." (*Id.*).

On May 18, 2009, psychiatrist Dr. Mandelbaum of the BEW Center prepared an Initial Psychiatric Evaluation and Treatment Plan. (R. 330-33). Although much of the report is illegible, it indicates that Plaintiff reported depression and insomnia since

childhood and, more recently, anxiety attacks once or twice a week with palpitations and sweating. (R. 330). During the examination, Plaintiff was "calm, cooperative, a bit anxious and 'intense' without aggressiveness" and "saddened" with decreased eye contact. (R. 331). Dr. Mandelbaum's diagnosis consisted of prolonged PTSD, chronic pain, and asthma. (*Id.*). He proposed a treatment plan of Prozac, supportive therapy, anger management intervention, journal writing, and medical follow-up, with a prognosis of guarded to good. (R. 332-33). Plaintiff returned on June 15, 2009 and received a refill of his Prozac but at a higher dosage. (R. 329, 335-36).

### 3.    State Agency Consultative Examinations (May 2009 – June 2009)

#### a.    Dr. White (Psychological)

On May 12, 2009, Don White, PhD, conducted a Psychological Evaluation for the Illinois Bureau of Disability Determination Services ("DDS"), including reviewing medical records and examining Plaintiff. (R. 297-99). Dr. White observed that Plaintiff "looked very suspicious, he would stand up and look around from time to time" and "asked if there was a video camera in the room." (R. 297). Dr. White noted, "He seemed to be relatively convincing, I'm sure there may have been some malingering." (*Id.*). Dr. White gave the following summary and conclusions regarding Plaintiff's mental status:

> Claimant has a history of mental problems, and also a significant anti-social conduct disorder. He also complains of anxiety and depression. Speech was understandable, comprehensible, and audible. Claimant complains of having thoughts of death, no suicidal plan. Complains of Psychosis, primarily, paranoid suspiciousness, auditory and visual hallucinations. Claimant is oriented as to person, place and time. There is no impairment in Recent or Remote Memory Functioning. Borderline Functioning in terms of Immediate Memory Functioning. Claimant's Fund of Information appears to be adequate. Ability to do Calculations, Abstract Thinking is impaired. Ability to Analyze and Synthesize Data appears to be impaired. Judgment is impaired.

(R. 299).

### b.    Dr. Henson (Psychiatric)

On May 29, 2009, Donald Henson, PhD, prepared a Psychiatric Review Technique for the DDS.  (R. 305-18).  Dr. Henson evaluated Plaintiff under Categories 12.04 (Affective Disorders) and 12.08 (Personality Disorders), and found that Plaintiff's impairments under these categories are "not severe."  (R. 305).  Dr. Henson diagnosed Plaintiff with depressive disorder NOS under Category 12.04 and antisocial personality disorder under Category 12.08.  (R. 308, 312).  In terms of Plaintiff's functional limitations, Dr. Henson found that these disorders result in mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and would not result in episodes of decompensation of extended duration.  (R. 315).  Dr. Henson found Plaintiff's statements about his symptoms partially credible given his history of treatment for depression, but did not fully credit Plaintiff's statements because he had no history of anxiety, but now complains of it, and because he denied having hallucinations while incarcerated, but now reports both auditory and visual hallucinations.  (R. 317).  Dr. Henson also noted that the consultative examiner "feels that claimant may have been malingering."  (*Id.*).

### c.    Dr. Velis (Internal Medicine)

DDS also arranged for consultations concerning Plaintiff's physical condition.  On May 12, 2009, Dr. Dean Thomas Velis conducted an Internal Medicine Consultative Examination, including reviewing medical records and examining Plaintiff.  (R. 301-04).  Dr. Velis noted that Plaintiff had open reduction and internal fixation with intramedullary

rods in both femurs[2] and complains of chronic and persistent pain, worse with weather changes, and morning stiffness. (R. 301). He also noted that Plaintiff stated that he limps, uses a cane at times, cannot walk more than a block or sit/stand for more than a few minutes, and rated his pain as 10 out of 10, with his only relief coming from analgesics or lying down. (*Id.*). Upon examination, Dr. Velis observed that Plaintiff is unable to rotate his right hip internally, had a maximum hip flexion of 90 degrees and had full range of motion in all other joints. (R. 303). Plaintiff was able to bear his own weight and displayed normal gait, had no difficulty getting on or off the exam table or getting up from the chair, and did not need an assistive device to walk. (*Id.*).

### d. Dr. Pardo (Physical RFC)

On June 2, 2009, Dr. Julio Pardo completed a Physical Residual Functional Capacity Assessment for the DDS. (R. 319-26). Dr. Pardo stated a primary diagnosis of status post-ORIF surgery of the right femur and a secondary diagnosis of status post-gunshot wound to the right hip. (R. 319). He concluded that Plaintiff can occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk (with normal breaks) at least 2 hours in an 8-hour work day, sit (with normal breaks) about 6 hours in an 8-hour work day, and is limited in his lower extremities in his ability to push or pull. (R. 320). Specifically, Dr. Pardo noted that Plaintiff "has decreased range of motion of his hips and has no hip rotation," and "could operate foot controls 1/3 of the day or less bilaterally as long as this did not require a lot of range of motion of his hips." (*Id.*). He found that Plaintiff is occasionally limited in climbing ramps or stairs, balancing, stooping, kneeling, crouching, and crawling, and is never able to climb ladders, ropes or

---

[2]     The record evidence indicates only that Plaintiff underwent ORIF surgery to his right femur. (R. 273, 346).

scaffolds due to his hip problems. (R. 321). Finally, he found that Plaintiff has no manipulative, visual, communicative, or environmental limitations, except that he should avoid concentrated exposure to extreme temperatures and pulmonary irritants due to his history of mild asthma and should avoid working around unprotected hazards due to his lack of agility. (R. 322-23). Dr. Pardo found Plaintiff's statements partially credible, taking into consideration his history of gunshot wounds, rod placement in his femur, and decreased range of motion in his hips, but noting that his physical examination did not support Plaintiff's assertion that he needs a cane to walk, given his normal gait, ability to tandem walk, and ability to get on/off the exam table and arise from a chair without difficulty. (R. 324, 326).

Approximately two weeks later, on June 16, 2009, the claim for benefits was denied based on a finding that Plaintiff was capable of performing sedentary work. (R. 68-76). On July 27, 2009, Plaintiff requested reconsideration, leading the Social Security Administration to request additional medical records (for treatment after June 2009) and new consultative examinations. (R. 76, 327-36, 338-43, 346, 348-52, 353-66, 371-73).

### 4. State Agency Consultative Examinations (Dec. 2009 – Feb. 2010)

#### a. Dr. Weiss (Internal Medicine)

On December 10, 2009, Dr. Debbie L. Weiss conducted an Internal Medicine Consultative Examination for the DDS. (R. 338-43). She observed the following:

> The claimant walks with normal posture and his gait is antalgic. He walked favoring the left lower extremity. He was able to walk for a minimum of fifty feet. He had no difficulty heel-walking, toe-walking and tandem gait was unsteady. He had no difficulty squatting to 60º of knee flexion. He was sitting on the examination table leaning on his left elbow. He could stand and was unable to do single leg balance.

(R. 342).  Dr. Weiss also noted that Plaintiff "did have some decreased range of motion in the right hip, although he was observed to be able to fully cross his right lower extremity over the left lower extremity." (*Id.*)

Also on December 10, 2009, two x-rays were taken of Plaintiff's right hip in support of his application for benefits.  (R. 346).  Dr. Mahesh Shah reviewed the x-rays for the DDS and concluded that they "reveal evidence of open reduction, internal fixation of fracture with hardware in good position" as well as "marked cortical irregularity of the proximal shaft of the femur." (*Id.*).

### b.    Dr. Raval (Psychiatric)

On December 17, 2009, Dr. Chirag Raval prepared a Psychiatric Evaluation for the DDS, including reviewing medical records and interviewing Plaintiff.  (R. 348-52).  Dr. Raval's findings and conclusions were consistent with the previous mental health evaluations for the DDS.  Plaintiff complained of "anxiety attacks throughout the day" and "dizziness and shortness of breath."  (R. 349).  Dr. Raval found Plaintiff to be "hypervigilant" and "irritable" but "cooperative."  (R. 349-50).  Plaintiff's speech was "clear and understandable" and he "demonstrated no evidence of hallucinations, delusions, confusions, or disorganized thinking during the interview." (R. 350).  Plaintiff was alert and oriented, but had difficulty with abstract thinking.  (R. 350-51).  Dr. Raval noted that Plaintiff "does not appear able to manage his own funds in his best interest due to his paranoia and poor cognitive functioning." (R. 351).  He diagnosed Plaintiff with post-traumatic stress disorder, depression NOS, antisocial personality, and status post gunshot wound and right leg deformity by history. (*Id.*).

### c.    Dr. DiFonso (Psychiatric and Mental RFC)

On January 26, 2010, M.W. DiFonso, PhD, prepared a second Psychiatric Review Technique for the DDS.  (R. 353-66).  Dr. DiFonso evaluated Plaintiff under Categories 12.04 (Affective Disorders), 12.06 (Anxiety-Related Disorders), and 12.08 (Personality Disorders), and found that no RFC assessment was necessary.  (R. 353).  Dr. DiFonso diagnosed Plaintiff with depressive disorder NOS under Category 12.04, post-traumatic stress disorder under Category 12.06, and antisocial personality disorder under Category 12.08.  (R. 356, 358, 360).  In terms of Plaintiff's functional limitations, Dr. DiFonso found that these disorders result in mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and would not result in episodes of decompensation of extended duration.  (R. 363).  In making these findings, Dr. DiFonso considered the prior mental evaluations by Dr. White and Dr. Henson in May 2009, as well as subsequent medical evidence, namely Dr. Mandelbaum's diagnosis of prolonged PTSD in May 2009 and Dr. Raval's psychiatric evaluation in December 2009.  (R. 365).

Also on January 26, 2010, Dr. DiFonso prepared a Mental Residual Function Capacity Assessment for the DDS.  (R. 367-70).  Based on the Psychiatric Review Technique, Dr. DiFonso found Plaintiff moderately limited in his ability to:  understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors.  (R. 367-68).  Dr. DiFonso concluded the following:

> Cognitive and attentional skills are intact and adequate for simple one-two step work tasks. [Plaintiff] carries out self care, cooks, cleans, shops. Performs reasonably well on cognitive tasks on MSE. Depressive symptoms and personality disorder issues moderately limit [Plaintiff's] ability to carry out detailed tasks.
>
> Interpersonal skills are moderately limited by social guardedness & antisocial P.D. Recommend moderate limitation of social expectations.
>
> Adaptive skills are within normal limits.

(R. 369).

### d. Dr. Gotanco (Medical Advice Upon Reconsideration)

Regarding Plaintiff's physical condition, on February 9, 2010, Dr. Reynaldo Gotanco completed a Request for Medical Advice for the DDS upon reconsideration. (R. 371-73). Dr. Gotanco reviewed all the evidence in file and affirmed Dr. Pardo's Physical RFC Assessment from June 2009, as revised to incorporate Dr. Weiss's consultative examination in December 2009. (R. 372-73). Specifically, Dr. Gotanco adopted Dr. Pardo's RFC and credibility assessment in their entirety, and incorporated Dr. Weiss's findings concerning Plaintiff's physical capabilities and limitations. (R. 373, citing R. 319-26, 338-43).

Shortly after this, on February 25, 2010, Plaintiff's request for benefits was again denied on reconsideration. (R. 73-76).

### 5. Ongoing Treatment at Stroger Hospital ER (Dec. 2009 – Aug. 2010)

On December 2, 2009, Plaintiff went to the Stroger Hospital ER, complaining of leg pain and seeking refills of Naproxen and Prozac, as well as Albuterol for his asthma. (R. 416). He received refills of all three medications. (R. 419). Plaintiff returned to Stroger Hospital four times in 2010 to refill prescriptions. In February, June and October 2010, he received refills of Naproxen and Tramadol for pain, as well as Prozac. (R. 403, 410, 414-15). During the June visit, he also received Abilify for depression,

though he stopped taking it a month later when he suffered a possible allergic reaction. (R. 397-98, 410). Finally, during a visit in August 2010, Plaintiff was prescribed Depakote and Fluoxetine (the generic name for Prozac) for his depression and he was discharged with the diagnosis of "Depression – Stable." (R. 405-07).

### 6. Ongoing Treatment at BEW Center (Feb. 2010 – Nov. 2010)

As discussed previously, Dr. Mandelbaum created a treatment plan for Plaintiff during a visit in May 2009, and saw Plaintiff again in June 2009. According to BEW medical records, Dr. Mandelbaum next saw Plaintiff in February 2010 as well as five more times in 2010. (R. 424-433). Dr. Mandelbaum's notes are difficult to decipher, but indicate prolonged PTSD, anxiety attacks, and feelings of anger and sadness. (R. 428, 430, 431, 433). The notes for a visit on February 25, 2010 indicate (in part): Plaintiff's mother is still in a coma; Plaintiff has "very poor Rx compliance;" and "SSI still pending." (R. 433.). Prozac was prescribed during this visit as well as during visits on April 19, 2010, June 17, 2010, July 21, 2010, August 30, 2010, and November 11, 2010. (R. 432).

During the visit on July 21, 2010, Dr. Mandelbaum for the first time noted a diagnosis of bipolar disorder. He also increased Plaintiff's Prozac dosage and prescribed Depakote. (R. 430, 432). That same day, Dr. Mandelbaum completed a Mental Impairment Questionnaire. (R. 374-77). His notation of the frequency and length of his contact with Plaintiff is illegible, as is much of the diagnosis, although it includes a diagnosis of rapidly cycling bipolar disorder. (R. 374). Dr. Mandelbaum concluded that Plaintiff has moderate restrictions of daily living; moderate difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence, or

pace resulting in failure to complete tasks in a timely manner; and has had three or more episodes of deterioration or decompensation in work or work-like settings that cause him to withdraw or experience exacerbated symptoms.  (R. 377).

Dr. Mandelbaum's notes indicate that Plaintiff was stable on his next (and final) two visits.  (R. 424-26).  Specifically, on August 30, 2010, he characterized Plaintiff as "stable on present meds."  (R. 426).  On November 11, 2010, he noted "no complaints," "lives independently," "eats [and] sleeps fine," "well dressed [and] looks good," "no evidence of psychosis," "not suicidal or homicidal," and "mood stable."  (R. 424-25).

Plaintiff's hearing before the ALJ took place approximately one month later on December 7, 2010.  (R. 30).

## B.     Plaintiff's Testimony

Before turning to Plaintiff's testimony during the hearing before the ALJ, the Court summarizes his statements from Social Security Administration function reports and work history reports.

### 1.     Work History Report Dated June 9, 2009

Plaintiff reported that, as a laborer/contractor doing evictions for the Sheriff's Department, he had moved furniture, belongings, and personal effects from apartments, businesses, and stores to the sidewalk.  (R. 162).  He performed this work 8 hours per day and 4 days per week between 2004 and 2006.  (*Id.*).  He also worked as a cook at McDonald's on a full-time basis between 2003 and 2005.  (R. 163).  Finally, Plaintiff had his own part-time moving business in 2005, taking calls for jobs and using helpers to perform the labor.  (*Id.*).

## 2. Function Report Dated April 27, 2009

Plaintiff stated that his leg injuries impact his ability to stand, lift, bend, walk, and run. (R. 151). He also stated that he has difficulty walking due to pain, "can only walk a half of a block," and "can only lift maybe 10 lbs." (R. 155). Under the topic of "Daily Activities," Plaintiff responded that he cooked food for the kids (R. 151), and checked the box "yes" as to whether "you prepare your own meals?" (R. 152). He wrote that he did this on a daily basis and described the food that he prepared as "boil noodles, hot dogs, rice, chicken, fries, hamburgers, sandwiches, TV dinners." (*Id.*).

Under "House and Yard Work," Plaintiff indicated that he is able to do "cleaning" and does not require help or encouragement doing these things, and it takes him 10 or 15 minutes. (*Id.*). He wrote: "I do house work because I feel safe and keep it clean for my children." (R. 153). Under "Shopping," Plaintiff wrote that he shops in stores for "groceries, clothes, furniture electronics or appliance[s]." (*Id.*). In response to a question concerning how often he shops and how long this takes, he responded: "depends. I can't be doing all that walking because the pain." (*Id.*). Plaintiff wrote that he does not go outside unless he has to because it's dangerous and "people want me dead" but he also responded that the places he goes on a regular basis are "church, sports events." (R. 153, 154). In the final "Remarks" section for "any added information you did not show in earlier parts of the form," Plaintiff described the metal rods and pins in his leg and hip, the fact that he had been shot 13 times in his life, and the mental anguish and anxiety attacks that he experiences. He also noted lower back problems from a gunshot wound near his spinal cord. (R. 157).

### 3. Function Report Dated September 18, 2009

After Plaintiff sought reconsideration of the June 2009 denial of benefits, he completed a second Function Report in September 2009. In this report, Plaintiff stated that from the time he wakes up until the time he goes to bed, his activities are brushing his teeth, taking a bath, eating, seeing his counselor on scheduled days, watching TV and sleeping. (R. 180). He noted that he does not prepare his own meals because he does not know how to cook. (R. 182). He said he has difficulty dressing and bathing because he cannot stand for long, limits his housework to washing dishes for two minutes, does no shopping, leaves his home twice per week, and uses public transportation. (R. 181-83). He also stated that he cannot sit for long periods of time; can lift 10-15 pounds; cannot squat, bend, kneel or climb; and can walk half a block before needing to rest for ten minutes. (R. 185). He noted that he uses a cane to walk, but that it was not prescribed by a doctor. (R. 186). He said he has difficulty handling stress and is afraid to go out in his neighborhood. (*Id.*).

### 4. Testimony before the ALJ on December 7, 2010

During the hearing before the ALJ, Plaintiff (age 33) testified that he last drove an automobile in 2006 for the eviction company. (R. 36). When asked "Why did you stop driving after 2006?" Plaintiff responded: "I got incarcerated." (R. 37). In terms of his activities of daily living, Plaintiff testified that he is able to bathe and dress himself, but needs to use the tub because he cannot stand in the shower. (R. 48). He lives with his grandmother but cannot help with cooking, laundry or grocery shopping. (R. 48-49). His friends visit "[e]very once in a while" and his children's mothers bring the children by twice a week. (R. 49). He is behind on child support and has not attempted to find work

since his release from prison "[b]ecause I don't get along with people, plus I can't stand up too long or sit down a long period of time" and because "I'm going through paranoid situations and from the pain, it causes aggravation and gives me flashbacks." (R. 50-51).

Plaintiff also testified that he has been shot a total of 13 times. (R. 41). Most recently, he was shot in the right hip on October 3, 2006 and shortly after that was incarcerated until April 15, 2009. (R. 37, 38). Plaintiff testified that he was also shot in the left leg in 2000 and has rods, pins, and bullets in both legs. (*Id.*). While in prison, he "was getting treatment for [his] hip," including x-rays and Ibuprofen, but did not receive physical therapy and his pain worsened when officers confiscated his crutches before he was fully healed. (R. 38-39).

After his release from prison in 2009, Plaintiff said he sought treatment at the county hospital for his physical pain and was prescribed Naproxen and Tramadol for leg pain. (R. 40). He testified that Tramadol, which he continues to take, "gave [him] a sense of relief at times" but that he does not take it daily because he was warned about becoming addicted. (*Id.*). He characterized his pain on a scale of one to ten as a "five or six" while on Tramadol and a "ten" without Tramadol. (*Id.*). Plaintiff stated that in addition to the pain in his upper legs and right hip, he also has back pain due to a gunshot wound "on the side of [his] back." (R. 41). He suffers from "tremendous pain at times the way I sit or stand up." He also stated: "My back bothers me. It got worse over the years. You know, mainly in the wintertime or when it rains, I feel all the pain from all over my body, where the locations I've been shot." (*Id.*).

Because of his pain, Plaintiff testified that during a work day he could lift "maybe five pounds or less" and carry it about 10 feet or less. (R. 42). Plaintiff also said that he "can't sit long" before needing to lie down for a period of time and change positions. (*Id.*). Contrary to his statement in his September 2009 Function Report, he testified that Cook County Hospital prescribed him a cane in 2009. (R. 43). He uses the cane "[e]very once in a while" when he has to go somewhere, although he did not have the cane at the hearing because it "broke by mistake" the night before. (*Id.*). Plaintiff stated that he could walk "[p]robably a half a block or less" without his cane and could climb "[m]aybe half a flight" of stairs before needing to rest. (R. 42-43). He said he has trouble with balance, but denied falling. (R. 44). Prior to using the cane, Plaintiff said he had "tremendous pain standing up too long from his injuries." (*Id.*).

Plaintiff also testified about his mental health. He stated that after his release from prison he began having anxiety attacks two or three times per week lasting 10-15 seconds each due to "stress and depression," particularly after his mother passed away about a month before he was released from prison. (R. 44-45). He testified that his doctors treated him with Prozac, but that it gave him "nosebleeds and shakes at times" so Dr. Mandelbaum prescribed Depakote, which allowed him to sleep at night. (R. 45-46). He said he previously went to "Bobby Wright" (the BEW Center) for counseling two or three times per week and had daily conversations with his counselor, but because he "expressed [him]self" in those meetings, he "narrowed it down to [one] a month," which is the frequency of his current visits. (R. 46). Plaintiff acknowledged having trust and anger issues, and testified that his anger has gotten worse since he began going to the BEW Center, but he is not currently receiving treatment other than seeing Dr.

Mandelbaum and his counselor once a month.[3]  (R. 47).  He believed that "they felt as though maybe it's unsafe" for him to participate in group therapy.  (*Id*.).  In terms of his interaction with others, Plaintiff stated, "I don't get along with nobody," and said that in his prior job he "sometimes" got along with supervisors and "sometimes, no." (*Id*.).  He said that "it's always be[en] somebody close to me that I know would be the ones that tried to kill me or police," and "family members betrayed me," and so he prefers to be "by myself and my kids and my grandmother."  (R. 47-48).  He concluded, "I don't feel safe around the public or friends."  (R. 48).

Plaintiff also answered questions posed by his attorney.  He testified that lying down is the most comfortable position for him "because if I sit up straight a period of time, my back starts hurting."  (R. 51).  When asked how many hours out of a day he is lying down, Plaintiff responded: "Maybe three, four hours.  Then I get up to use the bathroom, whatever like that, between hours."  (*Id*.).  His energy level during the day is "mild," although he does not nap.  (R. 53).  It takes him an hour and a half to get ready in the morning, compared to an hour or less before he was injured.  (R. 52).  He takes public transportation or has someone drive him to the BEW Center but sometimes has difficulties if he is waiting for the bus and there is no bench to sit on and so he is "forced to stand up a period of time."  (*Id*.).

Plaintiff testified that Dr. Mandelbaum diagnosed him with bipolar disorder.  He described his mood swings this way: "One minute I'll be okay and, you know, I'll start having flashbacks . . . from a result of the pain that I've been suffering a period of years to now that led to . . . the suffering I'm going through got worse, and it caused

---

[3]     The record shows 9 visits to the BEW Center between May 2009 and November 2010. (R. 424-33).

aggravation and get me angry, and sometimes I snap out and everything or, … yell at certain people. . . . I don't want them there, and tell them to get away from me and don't come around me . . ." (*Id.*).  This happens "maybe once or twice out of the day" and so "sometimes I have to be reminded to take my medicine that day, because I get enraged at times, and I don't think about taking my medicine or eating and stuff like that."  (R. 53).

**C.    Vocational Expert's Testimony**

Edward Pagella testified at the hearing as a vocational expert ("VE").  (R. 53). The VE identified Plaintiff's past relevant work as fast food cook, which is very low-end semi-skilled work at the medium level of physical tolerance, and evictions representative, which is low-end semi-skilled work at the light level.  (R. 55).

The ALJ then described a hypothetical individual of Plaintiff's age, education, and work experience who is able to perform "a reduced range of light work" consisting of occasionally lifting 20 pounds, frequently lifting up to 10 pounds, and standing and walking for up to 2 hours and sitting for up to 6 hours in an 8-hour work day.  (R. 56). The ALJ further specified that the individual can operate foot controls only one-third of the work day; can never climb ladders, ropes, or scaffolds but can occasionally climb ramps or stairs; can occasionally balance, stoop, kneel, crouch, or crawl; and should avoid concentrated exposure to extreme heat or cold, humidity, fumes, odors, and gases and work-related hazards.  (*Id.*).  In addition, the ALJ limited this individual to performing "simple one-, two-step work tasks."  (*Id.*).  Finally, the ALJ specified that this individual "can never have interaction with the public and only occasional interaction

with co-workers and supervisors," and therefore should have "no tandem tasks with co-workers" and should be assigned "work that is isolated in nature." (R. 56-57).

The VE testified that such an individual would be unable to perform any of Plaintiff's past relevant work because it would require standing for more than two hours per day and interacting with co-workers and the public. (R. 57). The VE then explained that there are three classifications at the unskilled level: clerical, service, or manufacturing occupations. (*Id.*). Such a hypothetical individual likely could not perform clerical or service occupations, he testified, because they require contact with co-workers and the general public, and involve more than simple one-, two-steps tasks. (*Id.*). The hypothetical individual could perform manufacturing occupations that allow for simple one- or two-step tasks, such as hand packer, hand sorter, or hand assembler. (*Id.*). The VE clarified, however, that while these occupations do not require interactions with others, they may involve "working in conjunction with others," such as on an assembly line or sorting items that are delivered by another worker. (R. 58-59). He stated that such a hypothetical individual could perform the requirements of representative jobs available in the Chicago regional economy, such as bench packager (4,300 jobs), bench assembler (3,200 jobs), and hand sorter (2,400 jobs). (R 59-60).

The ALJ then described a second hypothetical that assumes the same factors and limitations, but adding the additional requirement that the individual "can sit or stand at will" and "can occasionally have interaction with the public, supervisors, and co-workers." (R. 60-61). The VE testified that such an individual could perform the same three jobs he identified under the first hypothetical. (R. 61).

Next, the ALJ described a third hypothetical that assumes the same factors and limitations as the first hypothetical, but restricts the individual to "no interaction with the public and only occasional interaction with supervisors and co-workers." (R. 61). The VE again testified that such an individual could perform the same three jobs he previously identified. (*Id.*).

The ALJ then posed a fourth hypothetical that assumes the same factors and limitations as the first hypothetical, but restricts the individual to "no interaction with the public and no tandem tasks, no interaction with co-workers, and that is of an isolated nature to where they're only having occasional interaction with a supervisor." (R. 61). This time, the VE testified that there would be no jobs that such an individual could perform as there are no unskilled occupations with such limited interaction. (R. 61-62).

Finally, the ALJ posed a fifth hypothetical that assumes the same factors and limitations as the first hypothetical, but adds the restriction that the individual can only perform "essentially less than full-time work and it looks like the person, due to impairments, would be off from work more than three times a month. (R. 62). The VE stated that there would be no jobs available because "[t]ypically, an individual can only miss one-and-three-quarters [days] of work per month" to avoid termination. (*Id.*).

Plaintiff's attorney then asked the VE whether the use of a cane for walking changes the VE's response to the second hypothetical, which included a sit-stand option. (R. 63). The VE replied that use of a cane would only affect the individual's ability to perform the specified jobs if he needed to hold onto the cane to stand in one place because that would eliminate his ability to use both hands to perform his work tasks. (R. 63-64).

**D.     ALJ's Decision**

In her decision, the ALJ found Plaintiff not disabled under the relevant provisions of the Social Security Act.  (R. 450-61).  In applying the five-step sequential analysis required by 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff has not engaged in substantial gainful activity since the application date of February 17, 2009.  (R. 452).  At Step 2, she determined that Plaintiff has the severe impairments of "status post-ORIF right femur secondary to gunshot wound; depressive disorder, NOS, post-traumatic stress syndrome, and personality disorder.  (*Id.*).  However, at Step 3, the ALJ determined that none of these impairments or combination of impairments met or medically equaled any of the listed impairments identified in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 452-55).

Proceeding to Step 4, the ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") to perform "light work" as defined in 20 C.F.R. § 416.967(b), subject to the following limitations:

> The claimant can lift a maximum of 20 pounds occasionally and lift and carry up to 10 pounds frequently, stand/walk for a total of no more than 2 hours in a normal 8-hour workday and sit for a total of 6 hours in a normal 8-hour workday with an option to alternate between sitting and standing at will, and push and/or pull subject to the limitations on carrying/lifting to include operation of hand and/or foot controls with foot control operation restricted to no more than 1/3 of the day subject to postural limitations of never climbing ladders, ropes, or scaffolds, occasionally climbing stairs or ramps, and occasionally balancing, stooping, kneeling, crouching, or crawling; environmental limitations of avoiding concentrated exposure to extreme cold, extreme heat, humidity, respiratory irritants (fumes, odors, dusts, gases, poor ventilation, etc.), and hazards (heights, moving machinery, etc.); and mental limitations of performing unskilled and simple, routine, and repetitive work, and that requires minimal contact with supervisors, and co-workers, and no contact with the public.

(R. 455).  The ALJ's analysis under Step 4 is discussed later in this Opinion.

At Step 5, the ALJ found Plaintiff unable to perform his past relevant work, but relying on the VE, concluded that there are other jobs that exist in sufficient numbers in the Chicago Region that Plaintiff can perform, given his age, education, work experience, and RFC. (R. 459-60). These jobs were: bench packager, bench assembler, and hand sorter. (R. 460). Accordingly, the ALJ found that Plaintiff was not disabled since the date his application was filed. (R. 461).

## DISCUSSION

**A.     Disability Standard**

In order to qualify for Supplemental Security Income, a claimant must establish that he is "disabled" and eligible for SSI benefits as defined by the Social Security Act. 42 U.S.C. § 1382c(a)(3). A person is disabled if "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382(a)(3)(A). In order to determine whether a claimant is disabled, the ALJ conducts a standard five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals one of a list of specific impairments enumerated in the regulations; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is able to perform other work in the national economy. 20 C.F.R. §§ 404.1520, 416.920; *see also Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a

determination that a claimant is not disabled." *Zurawski*, 245 F.3d at 885 (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)); *see also* 20 C.F.R. § 404.1520, 416.920.

## B.   Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act.  42 U.S.C. § 405(g).  A "court will reverse an ALJ's denial of disability benefits only if the decision is not supported by substantial evidence or is based on an error of law." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).  Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008) (quoting *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)).  The reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "'build an accurate and logical bridge from the evidence to the conclusion.'" *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see also* 42 U.S.C. § 405(b)(1) (denial of benefits must contain a discussion of the evidence and a statement of the Commissioner's reasons).

## C.   Analysis

Plaintiff claims that the decision must be reversed because the ALJ: (1) failed to justify her determination to give no weight to his treating psychiatrist; (2) failed to

account for all of Plaintiff's limitations in the RFC determination; and (3) erroneously found him only partially credible. The Court addresses each argument in turn.

### 1. The Opinion of Treating Psychiatrist Dr. Mandelbaum

Plaintiff argues that the ALJ erred in giving no weight to the opinion of Plaintiff's treating psychiatrist, Dr. Mandelbaum, while giving some weight to the state agency consulting psychologist, Dr. DiFonso. A treating physician's opinion is entitled to controlling weight if two conditions are met: (1) the opinion is "well-supported" by "medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion is "not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as she provides an adequate explanation for doing so. *Punzio*, 630 F.3d at 710; *Schaaf*, 602 F.3d at 875; *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Here, the ALJ did exactly that. She explained that the record is devoid of any clinical or laboratory diagnostic records that support Dr. Mandelbaum's Mental RFC Assessment, dated July 21, 2010, which opined that Plaintiff's mental impairments "imposed frequent limitations on his ability to maintain concentration, persistence, or pace, and that he had experienced three or more episodes of decompensation." (R. 459, citing R. 377). The ALJ also explained how Dr. Mandelbaum's opinions in the MRFC are inconsistent with his own prior and subsequent treatment notes. Specifically, the ALJ observed that Dr. Mandelbaum "did not submit any treatment records that

indicated support of his opinion, no support was found in the treatment records he had earlier submitted, and all mental health treatment provided the claimant had been conservative." (R. 459). The ALJ's conclusion is consistent with Dr. Mandelbaum's treatment notes from July 21 and his three prior meetings with Plaintiff, which describe Plaintiff's anger, sadness, and anxiety, but make no reference to frequent limitations as to concentration, persistence, or pace, nor do they document any episodes of decompensation. (R. 428, 430-31, 433).

The ALJ goes on to find that Dr. Mandelbaum's "opinion is contradicted by later treatment records in which the psychiatrist opined the claimant was stable with medication." (R. 459). Indeed, Dr. Mandebaum's medication records show that on the same day he prepared the MRFC, he increased Plaintiff's Prozac dosage and prescribed Depakote for the first time (R. 342), and his treatment notes show that when he next saw Plaintiff on August 30, 2010, Plaintiff was "stable on [his] present meds" and showed "no psychosis" (R. 426). At Plaintiff's next follow-up visit on November 11, 2010, just a month prior to the hearing before the ALJ, Dr. Mandelbaum noted that Plaintiff was "clinically stable," "eats [and] sleeps fine," "mood stable," "no evidence of psychosis," and "not suicidal or homicidal." (R. 424). In sum, the ALJ identified sufficient evidence showing that Dr. Mandelbaum's MRFC opinion is contradicted not only by Dr. DiFonso, but also by Dr. Mandelbaum's own treatment notes. Accordingly, the ALJ provided an adequate explanation for discounting Dr. Mandelbaum's MRFC opinion.

### 2.    RFC Determination

Plaintiff also challenges the RFC determination.  In order to determine at Steps 4 and 5 of the analysis whether the claimant can perform his past relevant work or adjust to other work, the ALJ must first assess the claimant's RFC, which is defined as the most the claimant can do despite his limitations.  20 C.F.R. §§ 404.1520(e), 404.1545; Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, *2.  The RFC determination is a legal, rather than a medical, one.  20 C.F.R. § 404.1527(d).  In crafting the RFC, an ALJ must consider all functional limitations and restrictions that stem from medically determinable impairments, including those that are not severe.  *See* SSR 96–8p, 1996 WL 374184, *5.  An ALJ is not permitted to "play doctor" or make independent medical conclusions that are unsupported by medical evidence or authority in the record.  *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003); *Clifford*, 227 F.3d at 870.  An ALJ need not discuss every piece of evidence, but must logically connect the evidence to the ALJ's conclusions.  *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Berger*, 516 F.3d at 544.

### a.    Moderate Limitations in Concentration, Persistence, or Pace

Plaintiff first argues that the ALJ did not account for his moderate limitations in concentration, persistence, or pace because she failed to include any such limitations in her hypotheticals to the VE.  (R. 454; Doc. 24 at 7-9).  Plaintiff directs the Court to a line of cases in which the Seventh Circuit stated that limiting an individual to simple, routine tasks is generally not sufficient to account for deficiencies in concentration, persistence or pace.  (Doc. 24 at 8-9, citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010), *Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009), and *Craft v. Astrue*, 539

F.3d 668, 677-78 (7th Cir. 2008)).  According to Plaintiff, the ALJ violated this rule by merely restricting him to "performing unskilled and simple, routine, and repetitive work." (R. 455).

Plaintiff is incorrect in his assertion that the ALJ failed to pose hypotheticals to the VE that account for his moderate limitations in concentration, persistence or pace. "[T]here is no literal requirement that the terms 'concentration, persistence or pace' be used." *Adams v. Astrue*, 880 F. Supp. 2d 895, 912 (N.D. Ill. 2012) (citing *O'Connor-Spinner*, 627 F.3d at 619-20).  Where "a medical expert 'translated an opinion of the claimant's medical limitations into an RFC assessment' an ALJ may rely upon that translation." *Adams*, 880 F. Supp. 2d at 912 (quoting *Milliken v. Astrue*, 397 Fed. Appx. 218, 221-22 (7th Cir. 2010)); s*ee also Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002) (no error where physician translated moderate mental limitations into a specific RFC assessment that the plaintiff could still perform low-stress, repetitive work). That is precisely what happened here.  The ALJ posed an initial hypothetical to the VE, which all subsequent hypotheticals incorporated, that limited the individual to performing "simple one-, two-step work tasks."  (R. 56).  In fashioning this limitation, the ALJ relied on Dr. DiFonso's Mental RFC Assessment of January 2010, which found Plaintiff capable of performing "simple one-two step work tasks" despite his moderate cognitive and attentional limitations.  (R. 369).  Thus, unlike the cases Plaintiff cites, the ALJ here did not, on her own, translate Plaintiff's moderate limitations in concentration, persistence, or pace into RFC restrictions; she simply adopted the psychologist's translation.  This distinguishes this case from those cases cited by Plaintiff, in which the state agency psychologist did not translate the claimant's limitations into an RFC

assessment.  *See Milliken*, 397 Fed. Appx. at 221 ("None of these cases is on point. None holds that a limitation to unskilled work can *never* adequately account for moderate limitations in concentration, persistence and pace. And none involved a medical expert who effectively translated an opinion regarding the claimant's medical limitations into an RFC assessment.")

Plaintiff further argues that the ALJ "does not provide any explanation or reasoning for the ALJ's conclusion that, despite moderate limitations in concentration, persistence, or pace [Plaintiff's] only limitations were to performing unskilled and simple, routine, and repetitive work."  (Doc. 24 at 9).  Admittedly, there may be some confusion given that the RFC in the ALJ's decision restricts Plaintiff to "performing unskilled and simple, routine, and repetitive work" (R. 455), while the hypotheticals the ALJ posed to the VE restrict him to "perform[ing] simple one-, two-step work tasks" (R. 56).  But the outcome is the same because the language in the RFC is also modeled on Dr. DiFonso's translation.  For example, in limiting him to one-, two-step tasks, Dr. DiFonso found that Plaintiff "[p]erforms reasonably well on cognitive tasks" but that "[d]epressive symptoms and personality disorder issues moderately limit [his] ability to carry out detailed tasks."  (*Id.*).  In her decision, the ALJ expressly linked her RFC findings to Dr. DiFonso's opinion concerning how Plaintiff's difficulties executing detailed tasks are manifested, concluding: "Limiting the claimant to unskilled and simple, routine, and repetitive work compensates for the effects of depression and PTSD on his ability to understand, remember, and carry out detailed instructions and his decreased ability to maintain attention and focus."  (R. 458).  In any event, as the Seventh Circuit explained in *O'Connor-Spinner*, the purpose in requiring ALJs to "refer expressly to limitations on

concentration, persistence and pace" in the hypotheticals is "to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." *O'Connor-Spinner*, 627 F.3d at 620-21. Here, the ALJ did exactly that, by posing hypotheticals to the VE that directly adopted the one-, two-step task restriction set forth in the consulting psychologist's Mental RFC Assessment.

Finally, in his reply brief Plaintiff makes much of the ALJ's statement that she gave "some weight" to the physical and mental RFC assessments submitted by the state agency consulting physicians, but gave neither one controlling weight "as evidence added at the hearing, including the claimant's testimony to the extent it is credited, indicated the claimant was more limited than the consultants had assessed." (R. 459; Doc. 35 at 1). Plaintiff relies on this statement to argue that the ALJ's RFC limitation as to concentration, persistence, or pace is somehow unsupported because the ALJ "left an evidentiary gap" by not explaining which portion of her RFC accounts for her finding that Plaintiff is more limited in his mental limitations than the state agency psychologist found him to be. (Doc. 35 at 2). But Plaintiff's challenge to the RFC's mental limitations is confined solely to whether they adequately account for his moderate limitations in concentration, persistence, or pace. Here, looking at the ALJ's decision as a whole, there can be no question that the ALJ credited Dr. DiFonso's Mental RFC assessment as to Plaintiff's moderate limitations in concentration, persistence, or pace. Moreover, there is simply no evidence that contradicts or undermines this limitation, or suggests that Plaintiff's limitations in this area are more than moderate.

For these reasons, the RFC determination as to Plaintiff's moderate limitations in concentration, persistence, or pace is supported by substantial evidence.

### b. Sitting Limitations

Plaintiff next asserts that the ALJ erred in making an RFC finding that Plaintiff can "stand/walk for a total of no more than 2 hours in a normal 8-hour workday and sit for a total of 6 hours in a normal 8-hour workday with an option to alternate between sitting and standing at will." (R. 455). While Plaintiff acknowledges that "the ALJ does point to some evidence which supports her position," he argues that "she ignores significant evidence which is favorable to [Plaintiff's] claim and fails to discuss how she accounted for that evidence in her assessment." (Doc. 24 at 11-12). Specifically, the ALJ noted that during the consultative examination by Dr. Weiss, Plaintiff "was able to walk 50 feet, exhibiting an antalgic gait, without using an assistive device and could squat down with knee flexion of 60 degrees." (R. 458, citing R. 342). Plaintiff contends that the ALJ failed to consider certain of Dr. Weiss's other observations: reduced range of motion in the hips; moderate difficulty heel-walking and toe-walking; unsteady tandem gait; inability to do single leg balance; and the fact that Plaintiff was lying down when the doctor entered the room and remained sitting while leaning on his left elbow. (Doc. 24 at 11).

Of course, none of these findings from the consultative examination unequivocally demonstrate that Plaintiff is or is not able to sit for 6 hours in a work day with the option to sit or stand at will. Plaintiff thus relies heavily on his own testimony that he is unable to sit for long without pain and argues that the ALJ erred in failing to consider this. (Doc. 24 at 11). But the ALJ *did* acknowledge Plaintiff's testimony that

pain prevents him from walking, standing or sitting for any length of time. (R. 458). She simply declined to fully credit this testimony for reasons identified in her credibility analysis. As discussed in section 3 below, this Court is remanding the case in light of certain errors surrounding the ALJ's credibility analysis. Given this, the ALJ should also revisit the finding that Plaintiff is able to sit for 6 hours with a sit/stand option since this was based, in part, on the credibility assessment.

### 3. The Credibility Finding

The Court turns last to Plaintiff's challenge to the ALJ's credibility finding concerning his complaints of debilitating pain and mental impairments. In assessing a claimant's credibility when the allegedly disabling symptoms, such as pain, are not objectively verifiable, an ALJ must first determine whether those symptoms are supported by medical evidence. *See* SSR 96-7p, 1996 WL 374186, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to "consider the entire case record and give specific reasons for the weight given to the individual's statements." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (quoting SSR 96-7p). The ALJ "should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'" *Simila*, 573 F.3d at 517 (quoting 20 C.F.R. § 404.1529(c)(2)-(4)). Hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Schaaf*, 602 F.3d at 875; *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). Still, an ALJ must connect credibility determinations to

the record evidence by an "'accurate and logical bridge.'" *Castile*, 617 F.3d at 929 (quoting *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000)).

In this case the ALJ found that Plaintiff was "not persuasive" and that the objective evidence did not support the extent of Plaintiff's alleged inability to work for a number of reasons:

1) Plaintiff received only conservative treatment for his physical and mental impairments;

2) Plaintiff said pain in his legs prevented him from walking, standing, or sitting for any length of time but he was able to walk 50 feet without an assistive device and squat down with knee flexion of 60 degrees during the consultative exam;

3) Plaintiff testified that he needed to recline to minimize his pain but there was no evidence supporting this allegation;

4) Plaintiff denied doing any household chores but there was no evidence indicating that he was physically incapable of such tasks;

5) Plaintiff's grandmother reported that once every two weeks, he cleaned up and did the laundry, and Plaintiff told his treating psychiatrist that he had episodes where he could not sit still and so cleaned the house or exercised;

6) Plaintiff testified that he had been shot 13 times but nothing supported the extent of this statement; and

7) Beginning in August 2010, the treating psychiatrist consistently reported that Plaintiff was stable on his current medication and in November 2010 said Plaintiff was well dressed and "looks good" and was having no problems sleeping or eating.

(R. 257-58).

On appeal, Plaintiff argues that the ALJ failed to build a "logical bridge" from the evidence to her ultimate credibility conclusion because of errors in findings 1, 3 and 6 above. The Court agrees that the ALJ made certain errors in assessing credibility that necessitate a remand.

### a. Conservative Treatment

One reason the ALJ concluded Plaintiff was not credible was that he received "only conservative treatment" for his physical and mental impairments." (R. 457). But the only explanation given was that "[d]espite his allegations of pain in his right thigh and hip, and pain elsewhere in his body related to the multiple gunshot wounds he stated he had received, there is only one treatment record that presents [Plaintiff] seeking treatment for hip and leg pain since he was released from prison." (*Id.*). The treatment record referenced by the ALJ is from the Stroger Hospital ER on December 2, 2009. (R. 457, citing R. 416-19). In fact, however, Plaintiff returned to Stroger Hospital on four occasions in 2010 for refills of his pain medication. (R. 403, 405, 407, 410, 414-19). In addition, while in prison from December 2007 to April 2009, Plaintiff had approximately 8 sick call visits during which he complained of hip or leg pain (R. 229-33, 248, 250, 254-55, 264), including several instances where he declined treatment, such as refusing to take Prozac or allow a follow-up x-ray of his hip (R. 241, 263, 270, 280-89, 294).

More recently, in the approximately 20 months between his April 2009 release and the December 2010 hearing before the ALJ, Plaintiff received mental health counseling at the BEW Center on approximately 9 occasions. (R. 424-33). Thus, the treatment records do show that Plaintiff received Naproxen for pain and Prozac for mental impairments since his release from prison, and that on several later occasions he was also prescribed Tramadol for pain and Depakote for mental impairments. (R. 403, 405, 410, 419, 432). They also show that he met with a psychiatrist and counselor somewhat regularly since shortly after his release. (R. 424-40). Since the ALJ did not

explain the basis for the conclusion that Plaintiff's treatment was "conservative" other than to give the one example that was factually incorrect, remand is necessary.[4]

Plaintiff argues that the ALJ not only ignored evidence of more frequent treatment, but also did not question Plaintiff about his reasons for not seeking additional treatment. (Doc. 24 at 13-14). The Seventh Circuit has stated that "while infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding, we have emphasized that "the ALJ 'must not draw any inferences' about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care.'" *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009) (quoting *Craft*, 539 F.3d at 679); *see also* SSR 96-7p, 1996 WL 374186, at *7 (same).

On remand, the ALJ must explain the evidence and reasoning behind the conservative treatment finding and clarify whether she relied on the infrequency of treatment, the nature of the treatment provided, the modest nature of Plaintiff's complaints of pain (i.e., failure to complain that he continued to suffer pain despite the drugs), and/or other evidence. The ALJ should also explore the reasons why Plaintiff did not seek more or different treatment if his pain or mental impairments were as debilitating as he claims.

---

[4]     While the ALJ did not discuss it, there appears to be a large gap of more than one year (from October 2008 to December 2009) in treatment for complaints of hip and leg pain stemming from the 2006 gunshot wounds and surgery. In addition, the record is devoid of evidence of any treatment for the "tremendous" back pain and other pain that Plaintiff complained about resulting from older gunshot wounds. (R. 41). These older gunshot wounds did not prevent Plaintiff from working full-time in a job that required him to move furniture and other belongings from homes and businesses into the street during evictions, or stand all day as a fast-food cook. (R. 142, 162).

### b.    13 Gunshot Wounds

Plaintiff next challenges the credibility determination because the ALJ based it (in part) on her belief that Plaintiff had not been shot 13 times as he claimed.  Specifically, the ALJ acknowledged "there is evidence that [Plaintiff] had been shot multiple times" but then said "nothing … supports the extent of his statement."  (R. 458).  As Plaintiff points out, however, the medical records document two palpable bullets and approximately twelve scars on Plaintiff's body:  a 3 cm scar under the left breast, 2 cm and 1 cm scars in the right lower abdomen, an 18 cm scar in the midline abdomen, a 10 cm scar on the right upper thigh, three 1 cm scars with palpable bullet on the right calf, an 11 cm scar on the left upper lateral thigh, a 1 cm scar with palpable bullet on the left anterior thigh, and two 2 cm scars on the right back.  (R. 340-41).

Given such evidence of multiple gunshot wounds, the ALJ should have inquired further of Plaintiff before discrediting his testimony as to the number of gunshot wounds.  For example, she could have asked for details as to each of these alleged gunshot wounds: where did each bullet strike Plaintiff; what if any medical treatment did he receive and who provided it; and are there any physical manifestations of each gunshot wound.  Given the ALJ's failure to inquire of Plaintiff to allow him to substantiate his claim, and the existing evidence of many scars and even palpable bullets under the skin, the ALJ lacked a sufficient basis for concluding that Plaintiff was not truthful on this point.  (R. 458).  Of course, even if Plaintiff was shot 13 times (or some number close to this), the more important question is whether he suffers from continuing pain from older gunshot wounds.  Certainly these older wounds did not preclude him from working full-time in physically demanding jobs prior to his incarceration in 2006.

### c. Need to Recline Due to Pain

Plaintiff also argues that the ALJ erred in failing to credit Plaintiff's testimony that he "needed to recline to minimize his pain" (R. 458), but this argument is not persuasive. While the ALJ cannot reject Plaintiff's allegations of pain based solely on the medical evidence (or lack thereof), that is not what the ALJ did here. Rather, after finding that the medical evidence contained no support for Plaintiff's claim that his pain requires him to lie down constantly, the ALJ went on to identify other evidence that also undermined Plaintiff's claim, namely that he told his psychiatrist that he had episodes where he cleaned the house and exercised when he could not sit still, and his grandmother stated that he cleaned and did laundry every two weeks. (*Id.*).[5] Thus, the ALJ considered the complete record and gave specific reasons for not giving full weight to Plaintiff's statement that he must lie down constantly to ease his pain. *See Simila v. Astrue*, 573 F.3d at 517.

In sum, there is a lack of sufficient evidentiary support for two of the reasons the ALJ gave in support of the credibility determination relating to the conservative treatment of Plaintiff's physical and mental impairments and the 13 gunshot wounds. The Court is not in a position to determine how much weight the ALJ gave to these reasons in comparison to the others and so the case must be remanded.

---

[5] While the ALJ did not mention it, Plaintiff also indicated in his initial Function Report that he cleaned, cooked, and shopped for short periods. (R. 151-53). It was only after Plaintiff sought reconsideration of the June 2009 denial of benefits that he claimed in a second Function Report that he does not cook or shop and limits his housework to washing dishes for two minutes. (R. 181-83). As the Commissioner also notes in her brief, Plaintiff never complained to his treating physicians of any pain from sitting, but rather made these complaints solely to the ALJ, consulting physicians, or other agency employees concerning his application for benefits. (Doc. 31 at 6). For example, Plaintiff never complained of sitting pain to the medical personnel who treated him at VCC (R. 248, 250) or Stroger Hospital (R. 407, 416).

**CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 24] is granted in part and denied in part. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: November 19, 2013

_____

SHEILA FINNEGAN
United States Magistrate Judge